Violet Elizabeth Grayson (VEG-2792)
Scarola, Ellis LLP
888 Seventh Avenue – 45th Floor
New York, N.Y 10106
(646) 406-1512

Attorney for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X
John Doe,                                                      :    07 Civ. 8479 (AKH)(MHD)
                                                               :
                    Plaintiff,                                 :
                                                               :
              -against-                                        :    ECF CASE
                                                               :
Aleya A. Kusum, Ali Shariff,                                   :
Wells Fargo Bank, NA, and                                      :
New York City,                                                 :
                                                               :
                                                               :
                    Defendants.                                :
----------------------------------------------------------------X

**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

Introduction

Defendants Aleya A. Kusum, Ali Sharif, and Wells Fargo Bank, NA, have failed to respond to this Court's Order to Show Cause, after being timely served with said Order and all supporting documents. A Preliminary Injunction should therefore be entered against these defaulting defendants.

The City of New York *has* responded to this Court's Order to Show Cause. The City's response is internally contradictory. The City inconsistently urges: 1) that Plaintiff has not submitted evidence of a nuisance sufficient for the City to take action, and 2) that the City is already taking action and should be left to get on with it, unsupervised by either the Court or Plaintiff. As demonstrated below, the nuisance exists, its continued existence is irreparably harmful to Plaintiff and everyone on the block, the City's participation is necessary to abate the nuisance, and the City cannot be trusted to abate the nuisance without Court supervision. For these reasons, the Preliminary Injunction should issue against the City as well as defendants Kusum, Sharif, and Wells Fargo Bank.

<u>Argument</u>

I.

**A Preliminary Injunction Requiring Owner Defendants Kusum, Ali, and Wells Fargo to Abate the Nuisance Should Issue Forthwith Because They Have Not Responded to This Court's Order to Show Cause**

Defendants Aleya Kusum, Ali Shariff, and Wells Fargo Bank, were personally served with the Order to Show Cause, Summons, Verified Complaint, and supporting Memorandum of Points and Authorities in this action, all within the time frame dictated by the Order to Show Cause. They have willfully failed to respond.

More specifically, the Order to Show Cause and other documents listed above were served on Wells Fargo Bank's Legal Department, located at 633 Folsom Street, 7th Floor, San Francisco, California, 94107, before noon on October 4, 2007, by John Bernasconi, a paralegal well known to plaintiff's counsel. Mr. Bernasconi specifically directed the receptionist's attention to the Order to Show Cause, and informed her that the papers required the immediate attention of a lawyer. (See Bernasconi Declaration Re Service; Grayson Dec. Re Notice, paragraph 6) Wells Fargo Bank nonetheless failed to respond to the Order to Show Cause. (Grayson Dec. Re Notice, paragraph 7)

As for service on the individual defendants Aleya Kusum and Ali Shariff, an individual employed by New York Server served the Order to Show Cause, together with all the documents listed above, at Ms. Kusum and Mr. Shariff's apartment located at 8716 Homelawn Street, Apt 3G, Jamaica, Queens, New York, early on the morning of October 4, 2007. At about noon on October 4, 20007, Plaintiff's counsel received a telephone call from an individual who identified himself as Adel Nabile, and stated that he was "Ms. Kusum's manager for the building." Nabile indicated that he had received the court papers, and provided his telephone number and an address on Jericho Turnpike in Mineola. In the cordial conversation which followed, Mr. Nabile stated that he'd been trying to evict the drug dealers from 546 West 148th Street, that the City ignored his pleas for help, and that he was glad Plaintiff sued. Plaintiff's counsel responded that everyone could and should work together to get the problem under control. Nabile promised to take the legal papers to a lawyer that very evening. (Grayson Dec. Re Notice, paragraph 4) Nonetheless, defendants Kusum and Shariff failed to serve or file any response to this Court's Order to Show Cause. Plaintiff's counsel's follow-up call to Nabile was not returned. (Grayson Dec. Re Notice paragraph 5)

This Court having found sufficient basis in the Verified Complaint and accompanying Memorandum of Points and Authorities to issue an Order to Show Cause, and owner defendants Wells Fargo Bank, Aleya Kusum, and Ali Shariff, having failed to respond to said Order to Show Cause after receiving actual notice, this Court should forthwith issue a Preliminary Injunction requiring these owner defendants to abate the nuisance at 546 West 148th Street by putting a stop to the drug trafficking and other criminal activity at that location, and repairing all illegal and dangerous conditions at the building.

II.

A Preliminary Injunction Should Also Issue Requiring Defendant City of New York to Take The Steps Necessary to Abate the Nuisance

Because owner defendants Kusum, Ali, and Wells Fargo Bank have failed to respond to the Court's Order to Show Cause after receiving actual notice, it seems likely that any Preliminary Injunction this Court may issue requiring abatement of the nuisance by the owner defendants, is more likely to result in contempt proceedings and fines, than it is to result in prompt abatement of the nuisance. Plaintiff is a victim of a continuing tort and entitled to an effective remedy. Unless this Court is prepared to directly deploy United States marshals to enforce an abatement order against the owner defendants, an effective remedy would necessarily involve the City of New York. For the reasons set forth below, a mandatory injunction should issue requiring the City to provide plaintiff and everyone adversely effected by the Crack House with timely relief.

A. Plaintiff Has Demonstrated The Existence of A Serious Nuisance At 546 West 148th Street, Which the City Has the Legal Power to Remedy

The City's Opposition to Plaintiff's Motion for Preliminary Injunction is a wonder of obfuscation. As regards the criminal nuisance at 546 West 148th Street, the City, on the one hand, incomprehensibly suggests that the Complaint in this action, *verified by Plaintiff's resident building manager,*

somehow isn't evidence, and that Plaintiff therefore fails to shoulder his evidentiary burden. On the other hand, New York City Police Sergeant Timothy Vance swears that the "subject premises" have been "assigned to" the Narcotics Control Unit of the Department of Housing Preservation and Development for nuisance abatement. (Vance Declaration paragraph 6)

      While the City complains that Plaintiff has not submitted proof of a sufficient number of narcotics arrests and convictions to support City action under the Padlock Law, the City, tellingly, *does not deny that a sufficient number of arrests and convictions have in fact occurred.* The relevant information is under the City's control, and if the number of arrests and convictions were insufficient to support action under the Padlock Law, then the City would say so. The Padlock Law requires only one arrest, one conviction, and two violations of the narcotics laws within a twelve month period. (New York City Administrative Code section 10-155) In light of the narcotics dealing and police enforcement activity described in the Verified Complaint, as well as the City's act of assigning the building to the Narcotics Control Unit of the Department of Housing Preservation and Development, it seems highly unlikely that this minimal threshold has not been met.

As for the Nuisance Abatement Law, the City admits that proof of "violations" of narcotics laws is a sufficient predicate for abatement and closure, *regardless of whether there have been arrests or convictions.* (City Points and Authorities at 7) The City cannot seriously contest the presence of narcotics violations at 546 West 148th Street. Not only does the Complaint, verified under penalty of perjury, allege a stream of narcotics transactions continuing day and night, but the City itself has assigned the building to its Narcotics Control Unit (per the sworn statement of Sergeant Vance).

Contrary to the City's assertion, the other crimes committed at the 546 West 148th Street (i.e. the murder of Steerer Diggs, and the harboring of violent criminals) do provide a predicate for closure under the Nuisance Abatement Law. New York City Administrative Code section 7-703 (l) defines as a public nuisance subject to abatement any building "wherein there is occurring a criminal nuisance as defined by section 240.24" of the New York State Penal Code. Penal Code section 240.24 criminalizes maintenance of premises "where people gather for engaging in unlawful conduct," or creation of conditions "endangering the health and safety." This plainly covers the cauldron of crime which is 546 West 148th Street as described in the Verified Complaint.

Turning to the occupancy of the building and its physical condition, the City seeks to trivialize the dangerous conditions at the building, but simultaneously admits that City record show numerous dangerous conditions including fire hazards (unsafe boiler, defective sprinkler system, defective electrical wiring, and heat/hot water violations[1]), as well as the absence of carbon monoxide monitors, roaches, and overcrowding with an apartment being used as an SRO. (City's Points and Authorities at 8-9) The City admits that use of an apartment as an SRO, in violation of the building's Certificate of Occupancy, is subject to nuisance abatement, but urges that the numerous other violations do not fall within the purview of the municipal Nuisance Abatement Law. This is not so. New York Administrative Code section 7-703 subsection (e) defines as a public nuisance subject to abatement any violations of New York City Administrative Code sections 16-118 or 17-142. Section 16-118 involves the expulsion of garbage from a building onto the street. Section 17-142 covers every condition "dangerous to human life" or "detrimental to health," as well as overcrowding and inadequate sewers. Thus, the dangerous conditions listed in both the Verified Complaint and the City's own records as reflected in its Memorandum of Points and Authorities are nuisances subject to abatement under the Nuisance Abatement Law.

---

[1] Which the Verified Complaint alleges lead to the use of dangerous kerosene heaters.

The Nuisance Abatement Law explicitly provides for closure as a remedy. (New York City Administrative Code sections 7-711 and 7-712) So does the Padlock Law as its name implies. Closure, whether effected under the Padlock Law or the Nuisance Law,[2] will abate the nuisance at 546 West 148th Street. No one will deal narcotics out of a padlocked building. The building is unlikely to catch fire if it is closed and its boiler and electrical systems shut down. Moreover, once the building is vacant, the Bank, the present owners, the City, or whoever ultimately takes title to the building, can repair its physical structure and return it to the stream of commerce as a safe, lawful, and habitable abode.

Placement of a police officer in front of 546 West 148th Street, pending closure, is another action well within the City's capabilities which would provide people living near the nuisance with an important measure of immediate relief.[3]

---

[2] Plaintiff prefers that the City proceed under the Padlock Law because its procedures are more expeditious,

[3] The cases of *Weiner v. MTA*, 55 N.Y.2d 175 (1985), and *Riss v. City of New York*, 22 N.Y.2d 579, 582 (1968), cited by the City, stand for the proposition that a City will not ordinarily be held liable for injury to victims of crimes. They do not stand for the proposition that a federal judge may not require a city to post a police officer in front of a house of crime.

B. A Preliminary Injunction Is Necessary to Insure That the City Promptly Takes The Action Necessary to Abate the Nuisance, and Avert Irreparable Harm

The City is very cagey indeed about its plans for 546 West 148th Street. All one can say for certain is that the City is moving at a snail's pace, and does not wish to account for its actions to the Plaintiff or to this Court. According to Declarant Sergeant Timothy Vance:

> We are now in *the initial process of developing a plan* to address the issues of this property. Any steps that might be taken without being part of a comprehensive plan might very well backfire. In particular, the application by plaintiff that this Court post an NYPD police officer in front of the subject property might be detrimental to the possibility of *eventual* success at this location. It would not be prudent to provide a more detailed explanation in these papers. At the Court's request, further information an be given *in camera.*

(Vance Declaration paragraph 6. Emphasis added.)

Frankly, none of the above makes sense. Why is the City "in the initial stages of developing a plan," when this nuisance has been on-going for years? What is wrong with Plaintiff's plan for promptly closing the nuisance pursuant to either the Padlock Law or the Nuisance Abatement Law?[4] And how could posting a police officer outside the house be "detrimental to the possibility of eventual success?" Is Sergeant Vance implying that everyone on the block should be subjected to on-going drug

---

[4] If there are any genuine law-abiding tenants in the building, the City can provide them with relocation assistance. Such people are not benefited by residing without heat or hot water in a firetrap of a building where other people are selling crack cocaine and beating each other to death.

11

dealing, violence, danger, fear and filth, so that the police can continue to make more arrests and obtain more convictions?"[5]

The City's implication that the neighbors of the Crack House should continue to live in danger and fear, without a visible police presence, while the City slowly formulates a "plan," simply demonstrates the City's contempt for people of color. As stated in the Verified Complaint, this situation would not be tolerated for fifteen minutes on 73rd Street between 5th and Madison Avenues.

It bears emphasis that the statistics contained in Allen Schwartz's Declaration in Opposition to Motion for Preliminary Injunction do not support the City's position. The relevant comparison is between the 30th Precinct (West Harlem), and the 19th Precinct comprising the Upper East Side. While the statistics show that the City does bring some nuisance abatement actions in West Harlem, they also show that the threshold for bringing such actions in West Harlem is much higher than the threshold for bringing such actions on the Upper East Side. While (as this Court may take judicial notice) there are many more crack houses and buildings in serious disrepair in West Harlem than there are on the Upper East Side, the frequency with which the City brings nuisance abatement actions in the 30th

---

[5] The City's suggestion that it cannot reveal its plan in its court papers is disingenuous. If there was a sincere concern about the drug dealers obtaining access to the Court file, the City could have made a facsimile transmission to the Court with a copy to Plaintiff's counsel.

12

Precinct only slightly exceeds the frequency with which the City brings nuisance abatement actions in the 19th Precinct.[6] This bespeaks discriminatory enforcement.

 Plaintiff is not, as the City claims, suing as a "class of one" – i.e. bringing an Equal Protection claim unrelated to a suspect classification such as race. Precisely the opposite is true. Plaintiff is suing claiming that he and every other property owner and tenant in West Harlem is subjected to discriminatory treatment by a City which expects people in predominantly black and Hispanic neighborhoods to patiently tolerate dangerous nuisances like the Crack House, which no one would expect white people to tolerate. As the City concedes in its Memorandum of Points and Authorities, citing *Yick Wo v. Hopkins,* 118 U.S. 356 (1886), the Equal Protection Clause of the United States Constitution prohibits a municipality from treating residents with an "unequal hand" based on their race. (See also *Brown v. Board of Education,* 347 U.S. 483 (1954)) In particular, it is violative of Equal Protection for a City to provide inferior police protection to people because they are not white. (*Sinthasomphone v. City of Milwaukee et al.*, 785 F.Supp. 1343 (D. Wis. 1992))

---

[6] Indeed, the statistics reflect that in 2005, New York City actually brought more abatement actions in the 19th Precinct that in the 30th Precinct.

Plaintiff has standing to sue, to protect his own economic interests, and also the peace and safety of his own tenants and everyone else on the block. Defendant City properly cites *Lujan v. Defenders of Wildlife*, 504 U.S. 555, for the proposition that plaintiff must demonstrate an "actual," "concrete and particularized" "injury in fact" which is "fairly traceable to the challenged action of the defendant." Plaintiff has done this. He has demonstrated that the City's failure and refusal to exercise is power to abate the nuisance at 546 West 148th Street is lowering the market value of his property, making it difficult for him to find and keep quality tenants at market rents, subjecting his building to an increased risk of fire (not to mention roach infestation), and subjecting his tenants to an increased risk of injury, property loss, or even death, for which Plaintiff might be held liable. The City's assertion that Plaintiff's injury from the City's failure to abate the nuisance at 546 West 148th Street is "no different from that which could be claimed by residents of . . . other areas of New York City," simply is not true. Plaintiff suffers an injury which common to all property owners in the immediate vicinity of the Crack House, but not common to everyone in New York City. The fact that other property owners in the immediate vicinity of the Crack House also have standing to sue does not deprive Plaintiff of standing.

Finally, the on-going narcotics trafficking, violent crime, and intolerable physical conditions at 546 West 148th Street satisfy the irreparable injury requirement for issuance of a Preliminary Injunction. The City's assertion that Plaintiff is not being irreparably injured because, due to the alleged real estate boom in Harlem, he will make money on his investment regardless of whether his tenants are subjected to day and night noise from narcotics trafficking, harassment by addicts, snipers removing fugitives from the Crack House, murders and shootings in their immediate vicinity, and possible violence against their own persons and property, is phenomenally callous and cynical. The fact that a sophisticated owner/investor was the person with the education and resources to bring this lawsuit is not a reason why everyone on the block should be deprived of peace, safety and relief from conditions with the City concedes are unlawful.

This Court should accordingly order the City to immediately commence proceedings under the Padlock Law and/or the Nuisance Abatement Law to close down the nuisance at 546 West 148th Street. Pending closure, the City should station a uniformed police officer in front of 546 West 148th Street.

<u>Conclusion</u>

For all of the reasons set forth above and in Plaintiff's prior filings, a preliminary injunction should issue against each of the defendants in this case, requiring them to abate the nuisance at 546 West 148th Street with all deliberate speed.

Respectfully submitted,


V. Elizabeth Grayson (VEG 2792)
Counsel for Plaintiff, John Doe